Brady L. Rasmussen, USB #9619
**PARSONS BEHLE & LATIMER**
201 South Main Street, Suite 1800
Salt Lake City, Utah 84111
Telephone:  801.532.1234
BRasmussen@parsonsbehle.com

Eric S. Dwoskin, FSB 112459 (*pro hac vice* forthcoming)
**DWOSKIN WASDIN LLP**
433 Plaza Real, Suite 275
Boca Raton, FL 33432
Tel.: (561) 849-8060
edwoskin@dwowas.com

Norman E. Siegel (*pro hac vice* forthcoming)
J. Austin Moore (*pro hac vice* forthcoming)
Kasey Youngentob (*pro hac vice* forthcoming)
**STUEVE SIEGEL HANSON LLP**
460 Nichols Road, Suite 200
Kansas City, Missouri 64112
(816) 714-7100 (tel.)
siegel@stuevesiegel.com
moore@stuevesiegel.com
youngentob@stuevesiegel.com

*Attorneys for Plaintiff and the Proposed Class*

### IN THE UNITED STATES DISTRICT COURT
### FOR THE DISTRICT OF UTAH

| | |
|---|---|
| MIGUEL CORDERO, individually and on behalf of all others similarly situated,<br><br>Plaintiff,<br><br>vs.<br><br>SPORTSMAN'S WAREHOUSE, INC., and SPORTSMAN'S WAREHOUSE HOLDINGS, INC.,<br><br>Defendants. | **CLASS ACTION COMPLAINT**<br><br>Case No.   2:24-cv-575<br><br>Judge |

Plaintiff Miguel Cordero, on behalf of himself and all other similarly situated (the "Class Members"), brings this case against Sportsman's Warehouse, Inc. and Sportsman's Warehouse Holdings, Inc. ("Sportsmans") (collectively, "Defendants") which operate, control and manage the website, sportsmans.com. Plaintiff brings this action based upon personal knowledge of the facts pertaining to himself, and on information and belief as to all other matters, by and through the investigation of undersigned counsel.

## NATURE OF THE ACTION

1. This is a class action against Defendants for violating California laws intended to protect individuals' privacy rights based on their disclosure of protected information.

2. Defendants shared the contents of consumers' communications with the web tracking company, AddShoppers.

3. AddShoppers runs a marketing enterprise that unlawfully tracks persons across the internet, collects their personal information without consent, and then uses that information to send direct solicitations to them—without their consent or knowledge. So, for example, if a person creates an account to buy pet food on a retailer's website, and the retailer is part of the AddShoppers "Data Co-Op", AddShoppers surreptitiously captures the information provided to the retailer, tracks the person's web browsing across the internet, and then uses their information to provide targeted advertisements to the individual on behalf of members of the Data Co-Op.

4. This case seeks redress based on Defendants' decision to illegally share Plaintiff's and Class members' information.

## JURISDICTION AND VENUE

5. This Court has subject matter jurisdiction over this lawsuit under the Class Action Fairness Act, 28 U.S.C. § 1332(d), because this is a proposed class action in which: (1) there are at least 100 class members; (2) the combined claims of class members exceed $5,000,000.00, exclusive of interest, attorneys' fees, and costs; and (3) Defendants and at least one class member are citizens of different states.

6. This Court has personal jurisdiction over Defendants because their principal place of business is in Utah.

7. Venue is proper in this District because a substantial part of the events or omissions giving rise to the claim occurred in this District.

## THE PARTIES

8. Plaintiff Miguel Cordero is a resident and domiciliary of Sacramento, California.

9. Defendant Sportsman's Warehouse, Inc. is a Utah corporation with its principal place of business located at 1475 West 9000 South, Suite A, West Jordan, UT 84088.

10. Defendant Sportsman's Warehouse Holdings, Inc. is a Delaware corporation with a principal place of business located at 1475 West 9000 South, Suite A, West Jordan, UT 84088.

## FACTUAL ALLEGATIONS

**A.   AddShoppers and Tracking Technologies.**

11. While AddShoppers paints a benevolent picture of its marketing program called SafeOpt, the terms and conditions AddShoppers imposes on its partner business detail a much more invasive and sinister operation.

4887-3164-7959.v1

12.     AddShoppers requires its partner brands to share their "User Data" with AddShoppers, which includes "data collected by SafeOpt technology ... related to such Authorized Users' web browsing as a result of services rendered to you, as well as user opt-in consent to share the User Data with SafeOpt."[1]

13.     AddShoppers further requires participation in a "Data Co-op" which permits SafeOpt to "leverage[] a shared pool of user data collected by SafeOpt technology" by granting "SafeOpt with a limited, transferable license to their User Data for the purpose of providing identity resolution and direct messaging services for each Data Co-op member's audience."[2]

14.     AddShoppers' terms also permit it to collect all "Client Data" derived from its partner companies, including their customers' User Data, and states that "SafeOpt may exploit Client Data for any lawful purpose without any duty of accounting or compensation to you."[3]

15.     Exploit it does. AddShoppers surreptitiously collects and pools the sensitive personal information provided by individuals to online retailers in confidence, creates dossiers on those individuals, and then tracks them across the internet to monitor their web browsing for its own financial benefit.

16.     While AddShoppers' terms and conditions reference being granted a license to collect the personal information of its partner companies' customers (what AddShoppers defines as "authorized users")—the reality is the *users themselves* never authorized their data to be shared this way. Indeed, they had no idea that while buying a product their information was

---

[1] *SafeOpt Terms of Use Effective Date: May 12, 2021*, available at
https://www.safeopt.com/terms (last visited August 7, 2024).
[2] *Id*. at Data Co-Op.
[3] *Id*. at Client Data.

4

surreptitiously being transmitted to a company granting itself free rein to "exploit" their information as it chooses.

17. In an interview about its business, AddShoppers co-founder Chad Ledford described the operation of the Data Co-Cop as follows:

> [Chad Ledford]: Yeah, so there's kind of two data sources that we have. One is a blind Co-Op, which I would say half of our clients are participating in that, and the blind Co-Op is the brands submitting data into it in exchange for being able to use the data that comes out of it to activate the campaigns. We don't sync data, we don't actually put data into another system, it's all self-contained within our system, but about half of the volume that we see comes from that Co-Op of data.
>
> And then the other half comes from publisher relationships that we have where we license the data, and again, we don't sell data, or we don't push data out of it so that users can still control all their data, but it gives us additional scale so that we can start to match who these people are.
>
> [Interview host]: That's awesome. Was there any hesitancy with the brands sharing their data initially, or is it a little bit easier once they heard that other brands you were working with were already doing that?
>
> [Chad Ledford]: Yeah, we offer both. If they want access to the Co-Op data, they have to be part of it, so they have to submit to get access to it, that's basically what makes it the Co-Op. So, they can still work with us, and they can still tap into that publisher data, and **a lot of the enterprise brands that we work with will never submit any data to any other system including us, and it's just off the table, it's not going to get through legal.** We can still work with those brands, we just do it through our licensed publisher data. But the thing that gets us really excited is that idea of the Co-Op, and the brands being able to work together to do more together.[4]

18. In other words, AddShoppers operates a "data lake" where it collects as much information relating to a user as possible all from different sources, stores that information in a centralized location where it matches data points and creates detailed profiles on individuals, and

---

[4] Mission.org Podcast, *Diversifying To Become Future-Proof with Chad Ledford, Co-Founder of AddShoppers*, available at https://mission.org/up-next-in-commerce/diversifying-to-become-future-proof-with-chad-ledford-co-founder-of-addshoppers/ (emphasis added) (last visited August 7, 2024).

then uses those profiles to send direct, targeted advertisements from Co-Op companies even when the user did not authorize it. Ledford suggested that the company intends to collect and utilize even more personal information like "gender data" and "demographic data" as the company continues to grow.[5]

19. Central to AddShoppers' data collection operation is its use of malicious, third-party tracking cookies. Cookies are small text files that are stored on a user's computer or mobile device by a website. They are used to save information about the user's browsing activity, such as login information, shopping cart contents, and browsing history.[6]

20. But not all cookies are created equal. A first-party cookie is created and stored by the website the user is visiting, also known as the host domain. It may allow the website to collect customer analytics data, remember language settings, and carry out other useful functions that help provide a positive user experience. This means the browser can remember key pieces of information, such as which items added to shopping carts, username and passwords, and language preferences.[7]

21. Third-party cookies, by contrast, are those created by domains other than the one the user is visiting. These cookies are accessible on any website that loads the third-party server's code. Because they can be accessed by multiple domains, third-party cookies can be used to track a user's browsing activity across multiple websites.

---

[5] *See id*.
[6] Cloudfare, *What are cookies*, available at: https://www.cloudflare.com/learning/privacy/what-are-cookies/ (last visited August 7, 2024)
[7] Clearcode, *What's the Difference Between First-Party and Third-Party Cookies*?, available at https://clearcode.cc/blog/difference-between-first-party-third-party-cookies/#first-party-cookies (last visited August 7, 2024).

4887-3164-7959.v1

22. Companies that join the Co-Op agree to install AddShoppers' code on their website. When an internet user creates an account or makes a purchase with the business, a third-party tracking cookie is created that includes a unique value AddShoppers associates with that user. The cookie is hidden on the user's browser and automatically sends information to AddShoppers' SafeOpt domain "shop.pe." AddShoppers then associates that unique value with the personal information the user provided to the company, which typically includes, at a minimum, full name, address, payment card information, and email address.

23. With the tracking cookie hidden in the user's browser, AddShoppers can monitor the user's browsing activity across the internet. If the user lands on another website in the SafeOpt network, the cookie values "sync" and AddShoppers tracks the user's activity on the website, including the user's detailed referrer Uniform Resource Locator ("URL"). Because AddShoppers already associates personal information with the cookie value, it can directly advertise to the user even where the user leaves a website without affirmatively providing any personal information.

24. While companies often use "browser-abandonment" emails to encourage customers to return to their website and purchase a product they put in their cart but never purchased, the companies do so for users who have *already provided the company with their email address*. Likewise, when marketing companies use "cookie synching" to provide targeted advertisements (think searching online for a pair of shoes and later seeing those shoes in an advertisement on your browser), the cookie value they use is an anonymized identification number that is not associated with any personally identifiable information ("PII") tied back to the user.

7

25. AddShoppers, by contract, *intentionally associates* PII with the unique cookie value assigned by AddShoppers, the basis for its entire business model. In fact, in a now deleted blog post, AddShoppers describes its use of unsolicited, targeted emails to increase sales:

> **Send 2x-5x more personalized triggered emails with incremental campaigns.**
>
> **The Problem** Marketers are unable to send email reliably to customers that have not provided their email previously. This means more than 95% of your web visitors cannot receive a relevant email from you.
> **The Solution** Connecting the AddShoppers network of 150M+ shoppers through its Email Retargeting® Co-op, marketers are able to resolve identities and deliver 1:1 email regardless of customer email acquisition.
>
> **How it works** Today, if 100 customers visited your website — between your ESP [email service provider], CRM [customer relationship management], and other platforms — you might be able to send a browse abandon or cart abandon email to 4-5 of those site visitors. What about the other 95 visitors? Without AddShoppers your only option is retargeting ads, which continue to get more and more expensive.
>
> With AddShoppers, our system will attempt to match the 95 visitors in real-time against our network of 150M+ monthly profiles and 5,000+ websites. If the visitor leaves your site without signing up for email or buying AND we find a match, AddShoppers will enable a triggered email sequence to help you win back those customers and engage them in a way you can't today.



> **Browse + Product Abandon Reminders** A customer is shopping in your catalog as a guest (no sign-in required) and leaves the site without adding a product to shopping cart. Send them the products or content they were looking at directly to

4887-3164-7959.v1

their inbox. This typically doubles the performance you're getting from dynamic retargeting ads.

**Active Cart Abandon Reminders** A customer is shopping on a website as a guest and leaves the cart without checking out. With our email retargeting, the marketer can send a personalized and timely communication to the consumer in a more direct medium, redirecting the consumer back to the site to complete the purchase.[8]

26. AddShoppers co-founder Chad Ledford also confirmed in an interview that AddShoppers' business model hinges on its ability to send targeted emails to individuals who never voluntarily provided their email address to a member of the Data Co-Op:

[Chad Ledford]: Yeah so, most digital commerce brands realize the value of email today, especially whenever it comes to retention and lifetime value. So, the conversations are a little bit easier now because they understand that it is a really strong channel, and it's one that they have to defend, but most brands can only tap into what's considered first party data. So, first party data is data that the brand captured themselves. So, a lot of people build up emails from popups, or they capture it during the checkout process or things like that, but that usually ends up being anywhere from like three to 5% of their traffic that they've spent a lot of money to get to their site that they're actually able to capture, and be able to continue creating that relationship with them.

**So, the problem that we help solve today is tapping into that other 95% of people that are on the website, people that haven't given them their email address yet, but they're still showing a lot of engagement, and they probably still want to try to get those people to be their customers**.

[Interview host]: **Got it, so the people who are just casually browsing, or maybe added something to the cart and then left, the people like that who didn't directly give the brand their email, but maybe seemed kind of interested**.

[Chad Ledford]: **Yep, exactly**.[9]

---

[8] *Wayback Machine Screen Capture*, available at: https://web.archive.org/web/20200710211126/https://www.addshoppers.com/blog/email-retargeting-co-op (last visited August 7, 2024)

[9] Mission.org Podcast, *Diversifying To Become Future-Proof with Chad Ledford, Co-Founder of AddShoppers*, available at https://mission.org/up-next-in-commerce/diversifying-to-become-

9

27.     AddShoppers typically solicits in the form of a direct email from the retailer "via SafeOpt" imploring a user to return to the website to purchase a product they were looking at, even though the individual never gave their email address to the retailer or authorized such communications. Of course, AddShoppers does this with a pure profit motive as it takes a cut of all sales made "via affiliate links in emails, texts, apps, and content."[10]

28.     A software engineer who authored a blog post criticizing AddShoppers' marketing practices offered the following analogy: "Imagine if every store you visited would take a picture of you and then share and compare it with neighboring stores until they find one that you are a customer of and has your information. If such an agreement was in place, that store would now share who you are with the store that you are not yet a customer of and then add you to their marketing list. This is exactly what 'AddShoppers' does."[11]

29.     The consequences of this type of tracking are serious. Among many other privacy concerns, SafeOpt's network of businesses includes companies that sell highly personal products, including feminine hygiene and men's health products. As a result, SafeOpt can reveal exceptionally private information about customers to anyone that shares a computer. The software engineer who authored the blog post criticizing AddShoppers noted that he received an email to his personal account imploring him to return to buy a breast pump even though he never

---

future-proof-with-chad-ledford-co-founder-of-addshoppers/ (emphasis added) (last visited August 7, 2024).

[10] Email Retargeting Strategies for e Commerce Brands, available at https://www.safeopt.com/learn/email-retargeting-strategies-for-ecommerce-brands (last visited August 7, 2024)

[11] Heshie Brody, *I Was Emailed after Abandoning a Registration Form. I Did Not Click Submit. This Is Not Ok* (June 1, 2020), available at: https://dev.to/heshiebee/i-was-emailed-after-abandoning-a-registration-form-i-did-not-click-submit-this-is-not-ok-a63 (last visited August 7, 2024).

provided his information to the website.[12] Another internet user received emails from a colon cleansing company after he visited the website without providing any personal information.



30. AddShoppers' prized list of hundreds of millions of U.S. shoppers[13] was not gained through voluntarily consent. Unwittingly, shoppers become part of AddShoppers' SafeOpt network without ever signing up for the service; instead, "joining" SafeOpt by making a purchase from a company participating in AddShoppers' Data Co-Op and having their information traded without their knowledge and consent.

---

[12] *Id*.
[13] AddShoppers has recently claimed that has a "growing list of 250 million online shoppers and over 15,000 merchant brands."

31. Not only are AddShoppers' marketing and tracking practices unsavory, but they are also illegal. As deployed, AddShoppers' tracking software functions as a wiretap.

**B.    Defendants' Websites and AddShoppers' Tracking Technologies.**

32. Plaintiff Cordero recently requested his data from AddShoppers which shows he had been tracked by at least a dozen companies for several years, including the exact dates and times he visited other websites that (unbeknownst to him) were part of the AddShoppers network. One such website was Sportsmans, which surreptitiously captured information about Plaintiff Cordero's visit to its website on March 7, 2024. Although he never provided personal information (including his email) to Sportsmans, the company carefully tracked his visit and sent information back to AddShoppers to be included in the Data Co-Op.

```
sportsmans_com:
  last visit: '2024-03-07T16:47:18.672000+00:00'
```

33. Plaintiff Cordero never agreed to the terms and conditions for AddShoppers, or Sportsmans.

34. Plaintiff Cordero had his PII collected by AddShoppers and their online internet browsing monitored and tracked by AddShoppers without their consent. Plaintiff Cordero and class members all have an interest in controlling how their PII is used and shared. Their information has independent value, which is recognized by AddShoppers and members of the Data Co-Op who agree to collect and trade it for their personal gain. Plaintiff and class members are harmed every time their PII is used or shared in a manner to which they did not consent, particularly when it is used to solicit them for marketing and advertising purposes.

## CLASS ALLEGATIONS

35. **Class Definitions**:

Plaintiff Cordero seeks to represent a class of similarly situated individuals defined as:

All California residents had their personal information collected by AddShoppers and whose online activity was tracked by AddShoppers ("California Class").

36. Subject to additional information obtained through further investigation and discovery, the above-described Class may be modified or narrowed as appropriate.

37. Plaintiff satisfies the requirements of Rule 23.

38. Plaintiff seeks both monetary and equitable relief.

39. There is a well-defined community of interest in the questions of law and fact involved in this case. Questions of law and fact common to the members of the Class that predominate over questions that may affect individual members of the Class including whether Defendants disclosed the content of communications.

40. At this time, Plaintiff does not know the exact number of members of the aforementioned Class. However, given the popularity of Defendants' website, the number of persons within the Class are believed to be so numerous that joinder of all members is impractical.

41. There are unlikely to be difficulties in management of the action as a class action.

42. A class action is superior to other available methods for the fair and efficient adjudication of this controversy because individual litigation of the claims of all members of the Class is impracticable. Even if every member of the Class could afford to pursue individual litigation, the court system could not. It would be unduly burdensome to the courts in which

individual litigation of numerous cases would proceed. Individualized litigation would also present the potential for varying, inconsistent or contradictory judgments, and would magnify the delay and expense to all parties and to the court system resulting from multiple trials of the same factual issues. By contrast, the maintenance of this action as a class action, with respect to some or all of the issues presented herein, presents few management difficulties, conserves the resources of the parties and of the court system and protects the rights of each member of the Class. Plaintiff anticipates no difficulty in the management of this action as a class action.

43. Plaintiff's claims are typical of those of the Class because Plaintiff, like all members of the Class, used Defendants' website and had their information disclosed to a third party. Plaintiff possess the same interests and have suffered the same injury as other class members.

44. Plaintiff will fairly and adequately protect the interests of the proposed Class, as their claims are aligned with those of other Class members.

45. Plaintiff has retained and is represented by qualified and competent counsel who are highly experienced in complex consumer class action litigation, including litigation concerning the data privacy and SafeOpt tracking technologies in particular. Plaintiff and his counsel are committed to vigorously prosecuting this class action. Moreover, Plaintiff can fairly and adequately represent and protect the interests of the Class. Neither Plaintiff nor his counsel has any interest adverse to, or in conflict with, the interests of the absent members of the Class. Plaintiff has raised viable statutory claims or the type reasonably expected to be raised by members of the Class, and will vigorously pursue those claims. If necessary, Plaintiff may seek leave of this Court to amend this Class Action Complaint to include additional representatives to

14

4887-3164-7959.v1

represent the Class, additional claims as may be appropriate, or to amend the definition of the Class to address any steps that Defendants took.

46.     The complexity of this action, including discovery, in combination with the expense of litigating separate claims of individual Class members, which could result in potentially thousands of complaints, warrant a class being certified.

47.     Defendants have violated the statutory rights of all Class members and final injunctive and declaratory relief, in addition to statutory damages and an award of attorneys' fees and expenses are appropriate with regard to the Class as a whole.

## COUNT I
### Violation of the California Invasion of Privacy Act, Cal. Penal Code § 631

48.     Plaintiff Cordero repeat and reallege all preceding paragraphs.

49.     Plaintiff Cordero brings this claim individually and on behalf of the California Subclass against Defendants.

50.     To establish liability under Cal. Penal Code Section 631(a), Plaintiff need only establish that AddShoppers, "by means of any machine, instrument, contrivance, or in any other manner," did any of the following:

    i.      Intentionally taps, or makes any unauthorized connection, whether physically, electrically, acoustically, inductively or otherwise, with any telegraph or telephone wire, line, cable, or instrument, including the wire, line, cable, or instrument of any internal telephonic communication system;

    ii.     Willfully and without the consent of all parties to the communication, or in any unauthorized manner, reads or attempts to read or learn the contents or meaning of any message, report, or communication while the same is in transit or passing over any wire, line or cable or is being sent from or received at any place within this state;

    iii.    Uses, or attempts to use, in any manner, or for any purpose, or to communicate in any way, any information so obtained; or

iv.     Aids, agrees with, employs, or conspires with any person or persons to unlawfully do, or permit, or cause to be done any of the acts or things mentioned above in this section.

51.     Section 631(a) applies to "new technologies" such as computers, the internet, and email.[14]

52.     AddShoppers' software, including its SafeOpt service, is a "machine, instrument, contrivance, or . . . other manner" used to engage in the prohibited conduct here.

53.     At all relevant times, by using AddShoppers' technology, AddShoppers willfully and without the consent of all parties to the communication, or in any unauthorized manner, read or attempted to read or learn the contents or meaning of electronic communications of Plaintiff Cordero and putative class members, while the electronic communications were in transit or passing over any wire, line or cable or were being sent from or received at any place within California.

54.     By embedding AddShoppers' technology on its website, Defendants aided, agreed with, employed, and conspired with AddShoppers to carry out the wrongful conduct alleged. *See* Cal. Penal Code § 31.

55.     Plaintiff Cordero and members of the California Subclass did not consent to any websites' actions in implementing AddShoppers' wiretaps on the websites. Nor have either Plaintiff or class members consented to Defendants' intentional access, interception, reading, learning, recording, and collection of Plaintiff's and class members' electronic communications.

---

[14] *See Matera v. Google Inc.*, 2016 WL 8200619, at *21 (N.D. Cal. Aug. 12, 2016) (CIPA applies to "new technologies" and must be construed broadly to effectuate its remedial purpose of protecting privacy); *Bradley v. Google, Inc.*, 2006 WL 3798134, at *5-6 (N.D. Cal. Dec. 22, 2006) (CIPA governs "electronic communications"); *In re Facebook, Inc. Internet Tracking Litigation*, 956 F.3d 589 (9th Cir. 2020) (reversing dismissal of CIPA and common law privacy claims based on Facebook's collection of consumers' Internet browsing history).

56. Plaintiff Cordero and members of the California Subclass seek all relief available under Cal. Penal Code § 637.2, including injunctive relief and statutory damages of $5,000 per violation.

## COUNT II
### Violation of the California Trap and Trace Law, Cal. Penal Code § 638.51

57. Plaintiff repeats and realleges the allegations contained in all preceding paragraphs.

58. California Penal Code § 638.51 (California Trap and Trace Law) provides that "a person may not install or use…a trap and trace device without first obtaining a court order…"

59. A "trap and trace device" is "a device or process that captures the incoming electronic or other impulses that identify the originating number or other dialing, routing, addressing, or signaling information reasonably likely to identify the source of a wire or electronic communication, but not the contents of a communication." Cal. Penal Code § 638.50(c).

60. Defendants uses a trap and trace process on their website by deploying SafeOpt tracking technologies because the software is designed to capture the phone number, email, routing, addressing and other signaling information of website visitors. SafeOpt tracking technologies are therefore designed to precisely identify the source of the incoming electronic and wire communications to the website. Defendants did not obtain consent from Plaintiff or any of the class members before using trap and trace technology to identify users of its websites.

61. CIPA imposes civil liability and statutory penalties for violations of §638.51. California Penal Code § 637.2.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff, individually and on behalf of all others similarly situated, seeks judgment against Defendants, as follows:

a. Determining that this action is a proper class action;

b. For an order certifying the Class, naming Plaintiff as representative of the Class, and naming Plaintiff's attorneys as Class Counsel to represent the Class;

c. For an order declaring that Defendants' conduct violates the statute referenced here;

d. For an order finding in favor of Plaintiff and the Class on the count asserted here;

e. For Defendants to each pay civil damages in the amount of at least $5,000 per occurrence to the Plaintiff and other Class members as a result of the California statutory violations;

f. For prejudgment interest on all amounts awarded;

g. For injunctive relief as pleaded or as the Court may deem proper;

h. For an order awarding Plaintiff and the Class their reasonable attorneys' fees and expenses and costs of suit; and

i. Granting Plaintiff and the Class members such further relief as the Court deems appropriate.

## JURY DEMAND

Plaintiff hereby demands a trial by jury on all claims so triable in this action.

Respectfully submitted,

DATED August 9, 2024.

                        /s/Brady L. Rasmussen
                        Brady L. Rasmussen
                        PARSONS BEHLE & LATIMER

                        Eric S. Dwoskin
                        DWOSKIN WASDIN LLP
                        (*pro hac vice* forthcoming)

                        Norman E. Siegel
                        J. Austin Moore
                        Kasey Youngentob
                        STUEVE SIEGEL HANSON LLP
                        (*pro hac vice* forthcoming)